**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MEMBER SERVICES, INC.,**
**ROGER D. BANKS,  and R. AARON BANKS,**

                                                    **Plaintiffs,**

            **vs.**                                            **3:06-cv-1164**
                                                            **(TJM/DEP)**

**SECURITY MUTUAL LIFE INSURANCE**
**COMPANY OF NEW YORK, a New York Corporation,**
**ARCHWAY TECHNOLOGY SERVICES, INC.,**
**a New York Corporation, SCHMITT-SUSSMAN**
**ENTERPRISES, INC., a Delaware Corporation,**

                                                    **Defendants.**
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I.      INTRODUCTION**

        Plaintiffs Member Services, Inc., Roger D. Banks and R. Aaron Banks (collectively

"Member Services" or "Plaintiffs") commenced this action asserting claims of Trade Secret

Misappropriation, Copyright Infringement, Breach of Contract/Breach of the Covenant of

Good Faith and Fair Dealing, Breach of Fiduciary Relationship, Unjust Enrichment,

Tortious Interference with Business Relationships and Prospects, Common Law Unfair

Competition, and Fraudulent Misrepresentation. There are several motions presently

pending, including motions for summary judgment.  The Court will address the motions

1

*seriatim.*

## II.    BACKGROUND

There is significant disagreement between the parties as to the relevant and

material facts in this case. The parties have submitted thousands of pages of argument,

exhibits, and transcripts in an effort to seemingly try their cases on the papers.  The Court

declines that invitation.  To the extent possible, the Court will set forth the relevant

background of the case so that the discussion can be put in the appropriate context.

### a.    The Parties

Member Services, Inc. is a general insurance agency located in North Carolina and

owned by Roger Banks.  It markets insurance products and other employee benefits to

members of credit unions, including select employer groups (or "SEG"s) who are offered

benefits through a particular credit union.  Member Services' primary credit union client

was Piedmont Aviation Credit Union ("PACU") which sold insurance products to

employees of, *inter alia*, Lowe's Home Improvement Stores ("Lowe's").  Member Services

profited from the business relationship with PACU by receiving a share of insurance

commissions as a general agent of the insurance carriers.[1]  Aaron Banks is Roger Banks's

son and aided in the development of Member Services's computer program/business

method which is at the center of controversy in this matter.

Security Mutual Life Insurance Company of New York is a New York mutual life

---

[1] Security Mutual asserts that Member Services's "marketing approach was to first enroll individuals
as members of the Piedmont Aviation Credit Union ('PACU'), and then attempt to sell them insurance. ...
[Member Services] did not solicit insurance at credit union sites, and moreover, had a relationship with only
one credit union, PACU.  Lowe's, the home improvement retailer, was a SEG of PACU, and from 1997 until
2006 employees of certain Lowe's stores were [Member Services's] main source of business." Sec. Mut.
MOL pp. 1-2.

insurance company located in Binghamton, New York.   Archway Technology Services, Inc. ("Archway")  is a wholly owned subsidiary of Security Mutual (collectively "Security Mutual").

Schmitt-Sussman Enterprises, Inc. ("Schmitt-Sussman") is a general insurance agency located in Connecticut that does business under the name "PFP." Schmitt-Sussman is a marketer of individual insurance plans (life, disability, and critical illness sold as its "Family Security Plan") to members of credit unions, at credit union sites, at the sites of companies that endorse the credit unions (SEGs), and through an in-house call center.  Since 1998, Schmitt-Sussman has distributed its Family Security Plan life insurance product exclusively through Security Mutual.

> **b.**     **The Parties' Computer Programs/Business Methods pre-2003**

In 2003, Member Services and Security Mutual collaborated on a business project related to the Lowe's chain of home improvement stores (discussed below).  It is from this collaboration that the claims in this case arise.  In order to fully understand some of the claims and defenses asserted herein, it is necessary to understand each party's relevant computer programs & business methods as they existed before the collaboration.

> **1.**     **Member Services's *CU@Work System***

Member Services asserts that "Roger Banks, with the assistance of his son Aaron, and some computer programmers, was able to use his experience and knowledge of the credit union benefit market to create a fully automated business method that would stream-line and error-proof the benefit application and premium collection process for selling and administering life insurance." Mem. Serv. MOL p. 1.  In this regard, Member

Services contends:

> Between 1998 and 2002, Member Services created a business system
> comprised of both automated, computer driven technology and business
> practices, methods, and rules that together were referred to as *CU@Work* or
> the *CU@Work System*. The system allows for the both the sale and
> administration of insurance products and premium collection and eliminates
> many of the inefficiencies associated with the conventional process for the
> administration of insurance products . . . .

> The *CU@Work System* consisted of a "front-end" program used by Member
> Services' agents at the point of sale (the employees' work place) to collect
> information and complete credit union and insurance benefit applications,
> and a "back-end" program (a computer program initially referred to, in part,
> as *SEGSoft*) that processed, reconciled, audited and issued reports relating
> to the insurance benefits.

> The *CU@Work System* was able to, in an integrated manner, accomplish
> many related functions, including: (1) accessing and collecting relevant data
> from multiple databases (credit union, employer, and carrier) to populate a
> single authorization form for enrollment and authorization of premium
> deduction from the employees' paycheck; (2) creating a discrete escrow
> account for the deposit of premium payments; (3) implementing and
> administering a timed sweep of the escrow account to retrieve the required
> premium payment (4) performing automated verification and processing of
> the applications and deduction forms; and (5) performing reconciliation as
> well as detailed reporting related to sales and premium payments, including
> innovative reporting.

Mem. Serv. MOL pp. 1-2  (citing R. Banks Decl., ¶¶ 4-9; A. Banks Decl., ¶¶ 4-8).

Security Mutual argues that Member Services's system was much more

rudimentary than represented by Member Services.   According to Security Mutual, prior to

2003 Member Services merely

> had an electronic credit union membership information collection form strictly
> for use for [the Piedmont Aviation Credit Union] that an agent could use to
> collect credit union enrollment information from an individual and populate
> electronic versions of the credit union membership application and the
> accompanying deduction card/direct deposit form.  However, [Member
> Services] had no ability to do anything with this collected data other than
> print the form onto paper.  [Member Services] thus did not have the ability to
> store any information locally on a laptop computer for later electronic

4

transmittal over the internet to a home office, which is referred to as the ability to work in a "disconnected mode," or the ability to collect and transmit information over the internet in a "connected mode."  All [Member Services ] could do was electronically complete a single set of forms for a single individual and then print those forms so that they could be manually signed and mailed back to [Member Services's] home office and manually entered into [Member Services's]  back office tracking program.

Sec. Mut. MOL, p. 14.

## 2. Security Mutual's *ActivEnroller* and *LifeGuard* Programs

The parties also dispute the capabilities and functionality of Security Mutual's

programs as they existed prior to the 2003 collaboration. Security Mutual maintains:

By early 2001, Security Mutual's technology staff had begun to develop a computer program they named "*ActivEnroller*" to electronically collect employees' life insurance and other benefits applications at employer worksites.  A special branded version of this program, called "*LifeGuard*," was created by Security Mutual for Schmitt-Sussman, reflecting Schmitt-Sussman's particular business requirements for its credit union market. . . .   Using these programs on laptop computers, agents could electronically collect insurance application information, including applicant signatures, and then upload the information over the internet for processing by Security Mutual.  *LifeGuard* could also be used to collect and transfer information over the internet in a "connected" mode. In the case of existing policyowners, the programs enabled agents to retrieve stored personal information from Security Mutual databases or those of the credit union or employer.

In 2002, the information collected by *LifeGuard* was also used to electronically generate credit union account deduction cards that authorized periodic deductions for insurance premium payments from the credit union member's account at the credit union. The credit union used these forms to identify the portion of the member's funds to be placed into a dedicated subaccount for insurance purchased by the member. Premium payments would then be periodically collected from this sub-account. This process of premium collection from dedicated credit union sub-accounts, also referred to as "sweep accounts," had been employed by Schmitt-Sussman, Security Mutual and others in the industry for decades.

Sec. Mut. MOL pp. 1-2.

To the contrary, Member Services asserts that prior to January 2003, *ActivEnroller* "was essentially just an electronic life insurance application. That is, a computer rendering of a paper application with fields for entering information useful to apply for a Security Mutual life insurance product.  It is also disputed that *ActivEnroller* was used to take applications for 'other benefits' prior to January 2003."  Pl. Response to Sec. Mut. L.R. 7.1(a)(3) Stat. [dkt. # 246], ¶ 8.  Member Services asserts that *ActivEnroller* did not "process" applications. Id. ¶ 9.

Similarly, Member Services asserts that *LifeGuard* was merely an electronic life insurance application.  Id. ¶¶ 11-12.  "Neither the pre-2003 *ActivEnroller* nor *Lifeguard* programs provided authorizations from credit unions members to establish accounts, payroll deductions and transfer from accounts, or otherwise 'processed' any life insurance applications." Id. ¶ 12; see id. ¶ 17 ("When *Lifeguard*, in its original form, was rolled out in or about November of 2002, the only functions it accomplished was collection of data for an electronic life insurance application and an associated deduction card was created and printed in (TIFF format) using other software at the Security Mutual offices, and then forwarded for manual processing and implementation.")

### c.     The Collaboration

 In December 2002, Roger Banks contacted Security Mutual about the possibility of a collaboration.  Member Services asserts that Banks sought out the collaboration because "Member Services desired to bridge or connect Security Mutual's electronic life insurance application, which was represented to be the *ActivEnroller* program, to Member Services' existing *CU@Work System* for the credit union payroll deduction processing and

administration of the life insurance enrollments. The bridge was merely a conduit of the data between the existing *CU@Work.Asp* and Security Mutual's electronic insurance application." Pl. Response to Sec. Mut. L.R. 7.1(a)(3) Stat., ¶ 32.

> Member Services contends:
>
> The parties [verbally] agreed, among other things, that (1) Security Mutual would underwrite its Life Insurance product for sale to Lowe's employees by Member Services; (2) Member Services would disclose its *CU@Work* System to Security Mutual's programmers, under the protection of a non-disclosure agreement, for the sole purpose of building a bridge between *CU@Work* and Security Mutual's electronic life insurance application called *ActivEnroller*; (3) the combined program would be utilized by Member Services to sell Security Mutual's life insurance products exclusively to the Lowe's employer group; and (4) Security Mutual would advance Member Services $300,000 against future commissions.

Mem. Serv. Opp. MOL, p. 4 (citing R. Banks Decl. (II) ¶¶ 19-20).

According to Security Mutual, Brooks contacted Security Mutual to discuss Member Services selling life insurance for Security Mutual because Member Services was unprofitable selling American Heritage Life Insurance Company's ("American Heritage") product to Lowe's employees.  According to Security Mutual, throughout Member Services's association with American Heritage, Member Services had problems with the drafting of insurance premiums deducted from PACU member accounts resulting in "over $1 million in undrafted premiums sitting in PACU members' insurance accounts." Sec. Mut. MOL, p. 3.  Security Mutual contends that:

> As Security Mutual viewed the Lowe's market as a tremendous sales opportunity, Security Mutual and Member Services entered into Security Mutual's standard Worksite General Agent's Contract, effective January 21, 2003.
>
> During those meetings in January 2003, [Member Services ] indicated its desire for a fully functioning computer program that could electronically enroll individuals as PACU credit union members and also collect and process

insurance applications. . . .  Given the state of [Member Services's] technology development, and in order to promptly realize sales, Security Mutual began work to create a new computer program to be used by Member Services agents for the electronic enrollment of PACU credit union memberships and Security Mutual life insurance applications.

Id. p. 4.

### d.    The "new" Program

Although a non-disclosure agreement had not been signed, computer programers and technology staff from Member Services and Security Mutual met on several occasions in January 2003.  Member Services personnel disclosed certain information about Member Services's "system" to Security Mutual's technology team purportedly "to make them understand the [Member Services] technology and enable them to produce programming that would 'bridge' the [Member Services] programs to a computerized insurance application process then in use by SML." Mem. Ser. Opp. MOL, p. 5.  Member Services contends that Security Mutual took the "programming code, logic and business rules associated with *CU@Work* and rewrote ("re-engineered") them using a .jsp platform as *CU@Work.jsp* and did so without the prior knowledge or consent of Member Services." Pl. Resp. L.R.7.1(a)(3) Stat. ¶ 33.  "*CU@Work.jsp* was used with *ActiveEnroller (ASP)* program starting in February 2003, and proved to be an unsuccessful mismatch of a .jsp program with a .asp program." Id.

Security Mutual contends that it developed a new program by using its "previously developed software code from *ActivEnroller* for the electronic enrollment of life insurance applications. The new program also included code newly developed by Security Mutual to implement the specific PACU membership applications and deduction form, as well as the

8

'Flash' videos and worksheet to be used by [Member Services] agents in making sales

presentations." Sec. Mut. MOL, p. 3.  Security Mutual further contends that it named the

new program "*CU@Work*," at Plaintiffs' request, because Member Services was already

promoting its services under the name "*CU@Work*." Id.  According to Security Mutual,

"PACU membership applications and Security Mutual life insurance applications were

successfully enrolled by [Member Services] agents using Security Mutual's *CU@Work*

program in 2003." Id. p. 5.

> **e.**    **Letter of Understanding**

On February 28, 2003, Security Mutual provided a letter of understanding to

Member Services.  This indicated that Member Services, Archway, and Security Mutual

"will enter into a non-disclosure agreement protecting the intellectual property of each

entity.  *ActiveEnroller* will remain the sole intellectual property of Archway Technologies."

Sec. Mut. Ex. 23.   The letter of understanding further provides:

> [Member Services] is the owner of the source code for the Credit Union
> application and deduction processing functions in the *CU@Work* product
> that [Member Services] developed and that Archway Technologies has re-
> engineered in the joint project with [Member Services].  All aspects of the
> Insurance product processing and/or *Active Enroller* content remain the sole
> property of Archway Technologies.  All aspects of the *CU@Work* product
> processing and applications and deductions processing functions and
> content remain the sole property of [Member Services].  All rights reserved.
>
> The software code in *CU@Work* has been developed by Archway
> Technologies and Archway Technologies maintain the rights to development
> of derivative works.  The communication content, including scripts and credit
> union enrollment content has been developed by [Member Services], and
> they maintain sole intellectual property rights for that communication content.

Id.

Roger Banks, as President of Member Services, agreed to the terms of the letter by

9

signing it on March 2, 2003.  Id.

> **f.     The End of the Collaboration, Use of Proprietary Information & the Lowe's Business**

The collaboration between Member Services and Security Mutual began to rapidly deteriorate during 2003.  Member Services asserts that it became suspicious because Security Mutual failed to sign a non-disclosure agreement.  In February 2003, Roger Banks purportedly learned of Security Mutual's relationship with Schmitt-Sussman, and learned that Security Mutual had an exclusive agreement with Schmitt-Sussman to sell its products nationwide through credit unions.  Banks felt this was a violation of the verbal agreement that Member Services had with Security Mutual.   At about the same time, a computer programer for Member Services told Banks that the "staff at Security Mutual was not building a bridge between *CU@Work* and *ActivEnroller* (both written for the .ASP platform); but rather Security Mutual began re-writing the code of Member Services' *CU@Work* program and its own *ActivEnroller*, as one program in a different language – JSP." Mem. Serv. MOL p. 6.

Member Services further contends that, following its disclosure of its *CU@Work* program to Security Mutual, Security Mutual upgraded *LifeGuard Version 1* to *LifeGuard Version 2.0* which effectively changed the program from "just an electronic life application" to a "completely different" program "that exhibited many of the *CU@Work* signature functions."  Id. p. 11.  Plaintiffs assert that Security Mutual "used certain code from the original *CU@Work* disclosure" to accomplish this upgrade, and that Security Mutual was then using Member Services' proprietary information to assist one of its competitors - Schmitt-Sussman.  "At the same time, Security Mutual provided Member Services with a

bug-ridden and often inoperable version of *CU@Work.jsp*.  Because Security Mutual had rewritten it and would not allow Members Services' technical people to fix it, Member Services lost critical momentum in the industry and lost face with Lowe's for failure to deliver call center operability for the re-written *CU@Work* program." Id. p. 12.

According to Member Services, in May of 2003 and without the involvement of Member Services, "Security Mutual was negotiating with an insurance company named Trustmark regarding adding an additional Trustmark 'critical illness' ("CI") electronic application for *CU@Work*." Id. p. 10.  From a document produced in the collaboration between Security Mutual and Trustmark, there was also an indication that "Schmitt-Sussman had already been offered the right to use the *CU@Work* program, impliedly by Security Mutual, but had failed to put the *CU@Work* program on their system." Id.; see id. p. 9 (in mid-2003, Security Mutual "disclosed *CU@Work*" to Schmitt-Sussman).[2]

Member Services also contends that "Security Mutual breached its agreement with Member Services yet again in late 2003, by contacting PACU to try to supplant Member Services and become a direct agent to Lowe's itself." Id.  Member Services asserts that Security Mutual colluded with Schmitt-Sussman to "carve up" Member Services' Lowe's

---

[2]Schmitt-Sussman asserts that this representation is disingenuous.  In making the assertion that Security Mutual disclosed the *CU@Work system* to Schmitt-Sussman, Plaintiffs rely solely on a draft agreement provided by Trustmark to Security Mutual and which mentions Schmitt-Sussman in only one section of the draft agreement (section 1.0(p)).   However, as Schmitt-Sussman points out, the draft agreement was sent with a cover email which indicates: "Attached is a 1st attempt at the Member Services' *CU@Work* agreement.  You will note that I began with the LifeGuard contract and only changed the names/parties and fees as necessary."   Schmitt-Sussman asserts that the cover email, preamble, and terms of the agreement clearly indicate that the agreement concerns Trustmark business written by Member Services using *CU@Work*, and that the reference to Schmitt-Sussman in section 1.0(p) "is entirely illogical and can only be interpreted as a drafting mistake by the Trustmark representative."  Schmitt-Sussman Reply MOL p. 2.

business.  "[B]y 2004, before terminating its agreement with Member Services, Security

Mutual had secretly colluded with [Schmitt-Sussman] promising not to honor its

commitments to Member Services, and to otherwise directly solicit the Lowe's business

which is the express subject of the agreement in the original Letter of Understanding." Id.

p. 13.

Security Mutual tells a decidedly different story leading to the end of the

collaboration.  According to Security Mutual,

> [i]n mid-2003, Member Services approached a software development
> company in Vermont named Level 9 to create a new "*CU@Work*" program to
> replace the program Security Mutual had created. [Member Services] also
> approached another life insurance company, Trustmark, about taking over
> the Lowe's case, and in 2004, [Member Services] began to sell life insurance
> for Trustmark.  Insurance applications were then taken using Trustmark's
> insurance enrollment program, and PACU membership applications were
> taken using the new Level 9 program. By mid 2004, [Member Services]
> effectively stopped selling life insurance for Security Mutual. The Worksite
> General Agent's Contract with [Member Services] was terminated by
> Security Mutual effective November 1, 2004, and Security Mutual ceased
> any and all use of the *CU@Work* program.

Sec. Mut. MOL pp. 5-6.

Security Mutual asserts that Member Services continued its relationship with

Lowe's after ending its collaboration with Security Mutual by contracting "with a sales

distribution firm, PMA, to assist its sales efforts." Id. p. 6.  While Member Services, in

conjunction with PMA, continued to sell Trustmark products to Lowe's employees, in May

2006 Lowe's announced that it was ceasing to sponsor PACU as its official

credit union. Id.  Lowe's also announced that PACU representatives (meaning Member

Services and PMA) would no longer be allowed in Lowe's stores and, in early 2007,

PACU's new President and CEO terminated PACU's relationship with Member Services

because the President "did not believe in outsourcing member service functions, and because PACU had changed its charter to become 'community-based' rather than 'SEG-based.'" Id.  Thus, Security Mutual contends, "the end of [Member Services]'s business with Lowe's and PACU was absolutely unrelated to Security Mutual." Id.

Further, Security Mutual contends that

[a]fter termination of the Worksite General Agent's Contract with [Member Services], Security Mutual never again used the *CU@Work* program Security Mutual created.  Furthermore, at no time were the *ActivEnroller* and *LifeGuard* programs ever used to collect credit union membership applications, make sales presentations, or implement a credit union worksheet for enrollments.  Security Mutual continued to do business as it had prior to its relationship with [Member Services], namely, *ActivEnroller* was used to collect and process electronic insurance and benefits applications at employer worksites, and Schmitt-Sussman continued to use *LifeGuard* to collect insurance applications in the credit union market.

Id.

## III.   DISCUSSION

### a.     Motion to Strike Documents [dkt. # 233]

Plaintiffs move to strike certain documents submitted by Security Mutual in support of its motion for summary judgment, arguing that the documents are not proper evidence that may be considered on the motion.[3]  The Court is well versed in addressing Rule 56 motions and will consider only admissible evidence. That being the case, there is no reason to strike the documents.  Accordingly, Plaintiffs' motion is denied.

---

[3] Plaintiffs move to strike: (1) the sworn declaration by Albert J. Millus, Jr. Esq. (the "Millus Declaration") (Dkt. 219-2); (2) ten (10) deposition summaries providing the Defendants' characterizations of witness testimony (Dkt. 224); and (3) an unfiled proposed Second Amended Complaint and an unsigned and unfiled Stipulation of Dismissal, which were each prepared and offered as an unsuccessful effort to compromise a portion of this matter (Dkt. 221-16 & 221-17).

### b.    Security Mutual's Summary Judgment Motion [dkt. # 219]

Security Mutual moves for summary judgment seeking to dismiss all of Member

Services's claims against it.   Member Services has opposed the motion.

### 1.    Trade Secret Misappropriation Claim

Security Mutual moves to dismiss Plaintiffs' Trade Secret Misappropriation claim on

four grounds:  (1) Member Services failed to identify its trade secret with sufficient

specificity; (2) Member Services's alleged "fully electronic" business method was not in

use prior to January 1, 2003; (3) Security Mutual does not practice numerous aspects of

the alleged combination business method; and (4) Security Mutual was already practicing

the remaining allegedly misappropriated features prior to first meeting Member Services.

To state a claim for trade secret misappropriation under New York law,[4] the plaintiff

must establish "(1) it possessed a trade secret; and (2) [defendants are] using that trade

secret in breach of an agreement, confidence, or duty, or as the result of discovery by

improper means." Integrated Cash Management Servs. v. Digital Transactions, Inc., 920

F.2d 171, 173 (2d Cir. 1990).   A "trade secret" is defined by New York law as "any

formula, pattern, device or compilation of information which is used in one's business, and

which gives [the owner] an opportunity to obtain an advantage over competitors who do

---

[4]  All parties address the state law claims, including the trade secrets misappropriation claim, under New York law.  The Court agrees that New York law applies to the misappropriation claim.  Plaintiffs assert that their computer programer spent four days at Security Mutual's home office in Binghamton, New York "working intensively" with the IT staff of Security Mutual "to disclose the [Member Services'] system and program functionality fully to the members of the [Security Mutual]  team. . . ."  Nguyen Aff. ¶ 6.  Further, the newly developed program was used at Lowe's location in New York state.  These are sufficient contacts to satisfy the interest analysis choice of law provisions. See Brandwynne v. Combe Intern., Ltd., 74 F. Supp.2d 364, 375 n. 7 (S.D.N.Y. 1999)("New York law applies here because Combe Inc. and Combe Int'l are residents of New York and Brandwynne's disclosure and defendants' alleged misappropriation occurred in New York.")(citing Softel, Inc. v. Dragon Med. & Scientific Communications, Inc., 118 F.3d 955, 967 (2d Cir.1997) (applying New York law in trade secret case)).

not know or use it." N. Atl. Instruments, Inc. v. Haber, 188 F.3d 38, 44 (2d Cir. 1999)(internal quotation marks omitted).   "A trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret." Integrated Cash Mgmt., 920 F.2d at 174 (quoting Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp., 342 F.2d 737, 742 (2d Cir. 1965)).   "A trade secret, however, 'is not simply information as to single or ephemeral events in the conduct of the business; rather, it is a process or device for continuous use in the operation of the business.'" Medtech Products Inc. v. Ranir, LLC, 596 F. Supp.2d 778, 787 (S.D.N.Y. 2008) (quoting Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at *8 (S.D.N.Y. Feb. 20,  2008)).

Courts apply the following factors to determine whether information constitutes a trade secret:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; and  (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

N. Atl. Instruments, 188 F.3d at 44 (quoting Ashland Mgmt. v. Janien, 82 N.Y.2d 395, 604 N.Y.S.2d 912, 624 N.E.2d 1007, 1013 (1993)).   "The most important consideration remains whether the information was secret." Payment Alliance Int'l, Inc. v. Ferreira, 530 F. Supp.2d 477, 481 (S.D.N.Y.2007) (quoting Lehman v. Dow Jones & Co., 783 F.2d 285, 298 (2d Cir.1986)) (internal quotation marks omitted).  Whether the information was secret is "generally a question of fact." Ashland Mgmt., 604 N.Y.S.2d 912, 624 N.E.2d at 1013

(internal citations omitted).  Plaintiffs also bear the burden of describing the alleged trade

secret with adequate specificity to inform Defendants what it is alleged to have

misappropriated. Sit-Up Ltd. v. IAC/InterActiveCorp., 2008 WL 463884, at * 11 (S.D.N.Y.

Feb. 28, 2008).

Plaintiffs assert that their trade secret was the combination of processes

accomplished by the *CU@Work* system, and that the processes, as a whole, were

unknown and unpracticed in the industry other than by Member Services.  Taking the

highly disputed evidence in the light most favorable to Member Services, the original

*CU@Work System*, as one process, was able to, in an integrated manner, accomplish a

number of related functions, including: (1) accessing and collecting relevant data from

multiple databases (credit union, employer, and carrier) to populate a single authorization

form for enrollment and authorization of premium deduction from the employees'

paycheck; (2) creating a discrete escrow account for the deposit of premium payments; (3)

implementing and administering a timed sweep of the escrow account to retrieve the

required premium payment; (4) performing automated verification and processing of the

applications and deduction forms; and (5) performing reconciliation as well as detailed

reporting related to sales and premium payments, including innovative reporting. See R.

Banks Decl. ¶¶ 7-9; A. Banks Decl. ¶¶ 4-8; see also Feb. 28, 2003 Letter of

Understanding ("[Member Services] is the owner of the source code for the Credit Union

application and deduction processing functions in the *CU@Work* product that [Member

Services] developed...."); M. Elliot Decl. ¶¶ 12-15.[5]  This assertion satisfies the specificity

---

[5]Michael Elliot, Plaintiffs' forensic computer expert, purports to have traced certain code from the

(continued...)

requirement for an asserted "trade secret" made up of a combination of processes and operations.  See Sit-Up Ltd., 2008 WL 463884, at * 9 (requiring plaintiff to specify the "way in which [the] various components [of its 'secret sauce' business system] fit together as building blocks in order to form the unique whole").

Plaintiffs also assert that, prior to the collaboration, "everything was up and running" other than the electronic life insurance application, which was the reason for the collaboration with Security Mutual.  A. Banks Tr. (Def. Ex. T-2), pp. 142-43; see also id. p. 123 ("The only thing that the 1998 version of *CU@work*, the program, did not do was take electronic applications for the credit union.").  Crediting Member Services's assertion that it could (and actually did) accomplish all of the above referenced functions before the collaboration with Security Mutual, see Mem. Serv. MOL p. 16,[6] Plaintiffs have set forth enough to withstand the motion on the second ground asserted by Security Mutual.

The third and fourth grounds asserted by Security Mutual turn on disputed questions of material fact, that is, on the nature and functionality of Security Mutual and Member Services's respective computer programs before the collaboration.  Member Services asserts that, after the collaboration ended, Security Mutual incorporated Member Services trade secrets into its own programs and allowed other insurance companies to use these trade secrets, see Mem. Serv. Resp. L.R. 7.1(a)(3) Stat., ¶¶ 86 -113 (and

_____

[5](...continued)
original *CU@Work* disclosure to *LifeGuard* and *Peregrine*.  *Perigrine* is the base code for *CU@Work*, *ActivEnroller*, and *LifeGuard*.

[6] Mem. Serv. MOL p. 16: "Plaintiff has established, through the submission of admissible evidence, that it used its *CU@Work* System with customers prior to its disclosure to Security Mutual. R Banks Decl. ¶¶ 7-10; A. Banks Decl. (II) ¶¶ 8, 25. In fact, it derived substantial value from use of that System. R Banks Decl. ¶ 7, 10; A. Banks Decl. (II) ¶ 25."

citations contained threat), and that Security Mutual's computer programs could not accomplish these functions until after the collaboration. Id. p. 18.[7]   If the facts asserted by Member Services on these issues are established in its favor at trial, then the trade secret misappropriation claim could be resolved in Member Service's favor.  Accordingly, the motion in this regard is denied.

### 2. Copyright Claim

Security Mutual moves for summary judgment dismissing Member Services' copyright infringement claim (Second Cause of Action) on the grounds that (1) Member Services is not the owner of the underlying copyright, and (2) there is no similarity between the source code that Member Services purports to own and which is protected by the copyright, and any source code used by Security Mutual.  However, Security Mutual has provided no allegation or record citation in its Local Rule 7.1(a)(3) Statement of Material Facts relative to the copyright(s) in issue.  Thus, the motion on this ground is fatally flawed. See N.D.N.Y.L.R. 7.1(a)(3).[8]  The Court declines to search through the massive record in this case to investigate the circumstances concerning the ownership[9] and

---

[7]Mem. Serv. MOL p. 18: "The evidence shows that before being exposed to *CU@Work*, Defendants' insurance application had none of these capabilities. A. Banks Decl. (II) ¶¶ 11-13. Just months after being exposed to Member Services technology, Security Mutual unveiled *LifeGuard 2* and *ActivEnroller 2* that had many of the signature capabilities of the *CU@Work* System. Mr. Leska admits in his testimony that on a high level these programs are merely variations of *CU@Work*.  Leska Tr. at 77-78.  Plaintiff's computer expert, Michael Elliot, has been able to forensically trace the code in subsequent versions of *LifeGuard* back to *CU@Work*. M. Elliot Decl. ¶¶ 13-16; and Ex. A to Elliot Decl. at p. 23-29."

[8]("*Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.*" )(emphasis in original).

[9]Plaintiffs allege in the Amended Complaint that Plaintiff Aaron Banks has filed and been granted Certificates of Registration by the U.S. Copyright Office for several copyright applications, one of which (TXu0006591950) contains the source code for the *CU@Work* software program. Security Mutual asserts that the lawful owners of the copyright are Banks and Hong Nguyen, but that both were serving as

(continued...)

coverage of the purported copyright. See Amnesty America v. Town of West Hartford, 288

F.3d 467, 470 (2d Cir. 2002);[10] Monahan v. New York City Dep't of Corrections, 214 F.3d

275, 291 (2d Cir. 2000).[11]  Accordingly, the motion on this ground is denied.

### 3.  Breach of Fiduciary Relationship

Security Mutual moves to dismiss Member Service's Breach of Fiduciary

Relationship claim (Fourth Cause of Action) on the grounds that no fiduciary relationship

existed between the two.  Member Services opposes the motion.

"A fiduciary relationship 'exists between two persons when one of them is under a

duty to act for or to give advice for the benefit of another upon matters within the scope of

the relation.'" EBC I, Inc. v Goldman, Sachs & Co., 5 N.Y. 3d 11, 19 (2005)(quoting

Restatement [Second] of Torts § 874, Comment a)).  "Essential elements of a fiduciary

relation are . . . reliance, . . . de facto control and dominance.  Stated differently, a

---

[9](...continued)
independent contractors when they were granted the copyright for the source code and that neither has executed an agreement transferring ownership to Member Services.  In opposition to the motion, Plaintiffs assert that "Member Services is the *de facto* owner of its copyright and has standing to prosecute an infringement action."  Mem. Serv. MOL p. 23.  Plaintiffs further argue that

> Security Mutual's unsupported classification of Aaron Banks and Hong Nguyen as "independent contractors" vs an employee cannot carry the day as courts look to numerous factors underlying the employment relationship rather than the title to determine whether an employee-employer relationship exists. See, e.g., Salamon v. Our Lady of Victory Hosp., 514 F.3d 217, 228 (2d Cir. 2008). At a minimum, questions of fact exist as to this issue. See Langman Fabrics v. Graff Californiawear, Inc., 160 F.3d 106, 111 (2d Cir. 1998).

Id. p. 24, n. 8.

[10]("We agree . . . that Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")

[11](Local rules requiring Statements of Material Facts are "designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts. . . . While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.")

19

fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." <u>AG Capital Funding Partners, L.P. v. State Street Bank and Trust Co.</u>, 11 N.Y. 3d 146, 158 (2008)(interior citation marks and citations omitted); <u>see</u> <u>Scott v. Dime Sav. Bank</u>, 886 F. Supp. 1073, 1078 (S.D.N.Y.1995),[12] <u>aff'd</u>, 101 F.3d 107 (2d Cir. 1996).

"[A] fiduciary duty does not arise in the normal course of an arm's-length business transaction." <u>Lehman Bros. Commercial Corp. v. Minmetals Intern. Non-Ferrous Metals Trading Co.</u>, 179 F. Supp.2d 118, 151 (S.D.N.Y. 2000)(citing <u>Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.</u>, 785 F. Supp. 411, 426 (S.D.N.Y.1992)).   However, "a fiduciary relationship could potentially arise in a 'principal-to-principal' arm's-length relationship based upon the degree of trust that exists in that relationship."   <u>Id.</u>

Member Services asserts that the parties did not enter into a conventional, arms-length business relationship.

> Rather, Member Services, a much smaller company than Security Mutual, placed its trust in the integrity and fidelity of Security Mutual and its principals, in protecting its trade secrets. Security Mutual exhibited control over Member Services by leveraging Member Services' January disclosure of their trade secrets, to change the terms of the parties' agreement. Security Mutual further exhibited its dominance and control over Member Services trade secrets by commandeering its proprietary program, re-writing it, and housing it on its own website without giving Member Services' access. Security Mutual's elevated position of dominance and control in this relationship, beyond that of mere privity, raises material questions of fact as to whether Security Mutual owed a fiduciary obligation to Member Services, to which it breached.

---

[12] (The existence of a fiduciary relationship "cannot be determined 'by recourse to rigid formulas;' rather, 'New York courts typically focus on whether one person has reposed trust or confidence in another who thereby gains a resulting superiority or influence over the first.'") (citations omitted)

Mem. Serv. MOL p. 27.

Despite the rhetoric, the Court finds that there are no facts upon which a reasonable fact finder could conclude that Member Services and Security Mutual entered into a fiduciary relationship.  While it could be concluded that Member Services reposed trust or confidence in Security Mutual when it disclosed the source code for its *CU@Work* program, it cannot reasonably be concluded that the disclosure resulted in Security Mutual gaining superiority or influence over Member Services.  Rather, the facts indicate that the two worked together in an effort to further each of their own purposes, and that there was no domination or control of Member Services by Security Mutual after the subject disclosure was made.   Accordingly, the motion to dismiss the breach of fiduciary relationship claim is granted and the claim is dismissed.

### 4.    Breach of Covenant of Good Faith and Fair Dealing

In the Fifth Cause of Action, Plaintiffs assert that Security Mutual "breached implied duties of good faith and fair dealing with respect to the agreement that it made with Plaintiff [Member Services] and, by reason thereof, Plaintiffs have been damaged."  Am. Compl. ¶115.  There is no specific allegation in this cause of action that any contract was breached or that identifies the contract from which the implied duty of good faith and fair dealing purportedly arises.[13]  The Amended Complaint contains no other cause of action asserting a breach of contract.

To state a viable claim alleging breach of an implied covenant of good faith and fair

---

[13]There are 2 paragraphs in this cause of action: the first "reallege[s] paragraphs 1 through 113 as if fully set forth herein;" Am. Compl. ¶ 114;  and the second alleges that defendants Member Services and Archway "breached implied duties of good faith and fair dealing with respect to the agreement that it made with Plaintiff [Member Services] and, by reason thereof, Plaintiffs have been damaged." Id. ¶ 115.

dealing, a plaintiff must establish that the defendant prevented performance of the contract or withheld its benefits from plaintiff.  Aventine Inv. Mgt. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 514 (2nd Dept. 1999).  "While most courts do not permit a discrete cause of action for breach of the covenant of good faith and fair dealing (as distinguished from a cause of action for breach of contract), some courts have allowed a breach of covenant claim to stand where there are allegations that a defendant has exercised its rights under its contract in bad faith in order to realize gains that the contract implicitly denied or to deprive the other party of the fruit of its bargain, even if the plaintiff has not alleged a breach of that contract." Hudson Valley Bank, N.A. v. Banxcorp, Slip Copy, 28 Misc. 3d 1232(A), 2010 WL 3516076, at * 9 (N.Y. Sup. Ct., West. Cty, Sept. 7, 2010).

There is no dispute that the parties entered into Security Mutual's standard Worksite General Agent's Contract effective January 21, 2003.   The Worksite General Agent's Contract states that Member Services was an "independent contractor" of Security Mutual and that the agreement was terminable at will.  To the extent the allegation in the Fifth Cause of Action is that Security Mutual breached the implied duties of good faith and fair dealing by terminating the Worksite General Agent's Contract, the motion to dismiss is granted. See Lake Erie Distributors, Inc. v. Martlet Importing, 221 A.D.2d 954, 956 (4th Dept. 1995).[14]

---

[14]("The court erred, however, in denying defendants' motion to dismiss plaintiff's first cause of action against Martlet for breach of the covenant of good faith and fair dealing. The franchise agreement was terminable at will. Therefore, Martlet could terminate the agreement without cause and was not subject to the covenant of good faith and fair dealing. 'No obligation [under the covenant of good faith and fair dealing] can be implied ... which would be inconsistent with other terms of the contractual relationship.'")(quoting Murphy v American Home Prods. Corp., 58 NY2d 293, 304 (1983)).

However, Plaintiffs seemingly contend that the implied covenant arises in the scope of a verbal agreement between the parties whereby Security Mutual would take certain action with the newly developed *CU@Work* program to benefit Member Services, such as adding American Heritage and Trustmark products on the new *CU@Work* program.  See Sec. Mut. MOL p. 24;[15] Mem. Serv. Resp. L.R. 7.1(a)(3) Stat., ¶¶ 48-50.  Although Security Mutual disavows that a verbal agreement was reached, the Court must view the facts in the light most favorable to Member Services on this motion for summary judgment. The verbal contract, if it existed, was not void under the statute of frauds as Security Mutual argues because it was possible to accomplish within one year.  See Romaine v. Colonial Tanning Corp., 301 A.D.2d 732, 733 (3rd Dept. 2003).[16]  Assuming, *arguendo*, that a verbal agreement existed, an implied covenant of good faith and fair dealing governed the course of performing it. See Collura v. Collura, 18 Misc.3d 373, 379 (N.Y. Dist. Ct. 2007).[17]  To the extent that Plaintiffs assert that Security Mutual withheld the benefits of the verbal contract from Member Services, a viable claim for the breach of the implied covenant of good faith and fair dealing could be established at trial.  Accordingly, Security Mutual's motion to dismiss the Fifth Cause of Action is denied in this regard.

### 5.  Unjust Enrichment

In the Sixth Cause of Action, Plaintiffs assert that Security Mutual and

---

[15]("The claim, as amplified by plaintiffs' supplemental answers to interrogatories, is predicated on the allegation that Security Mutual failed to include Trustmark and American Heritage products on  *CU@Work*.")

[16](the statute of frauds does not apply to oral agreements if there is "any possible means of performance within one year")(quoting D & N Boening v. Kirsch Beverages, 63 N.Y.2d 449, 455 (1984)).

[17](all contracts, whether written or verbal, imply a covenant of good faith and fair dealing in the course of performance)(citing 511 West 232nd Owners Corp. v. Jennifer Realty Co., 98 N.Y.2d 144, 153 (N.Y. 2002)).

Schmitt-Sussman "were unjustly enriched by the wrongful and unauthorized use of Plaintiff's copyright protected and trade secret information and proprietary business methods in direct competition with Plaintiff [Member Services]." Am. Compl. ¶ 117. Security Mutual argues that Member Services' unjust enrichment claim must be dismissed because: (1) the claim is predicated on the validity of the trade secret misappropriation claim which, Securrity Mutual contends, is legally insufficient; and (2) no action for unjust enrichment will lie when an express contract exists between the parties.

On the first point, Security Mutual argues that "[o]nce the Court holds that defendants misappropriated nothing form [Member Services], this claim fails."  Sec. Mut. Reply MOL p. 13.  As explained above, however, there exists a question of fact as to whether Member Services had a protected trade secret as it asserts and, if it did, whether Security Mutual misappropriated it.  Therefore, the motion on the first ground is denied.

On the second ground, Security Mutual cites to the Worksite General Agent's Contract which provides that Security Mutual "shall have no liability to the Worksite General Agent for special, consequential, incidental or indirect damages, interest or attorney fees," and argues that a claim for unjust enrichment cannot arises out of the agreement.

"The theory of unjust enrichment lies as a quasi-contract claim." IDT v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142 (2009), rearg. denied 12 N.Y.3d 889 (2009).  "Unjust enrichment involves a claim by a party that it performed services on behalf of another at his or her behest, resulting in that party receiving an unjust benefit." In re New York State Urban Development Corp., Slip Copy, 26 Misc.3d 1228(A), 2010 WL 702319, at *29 (N.Y. Sup. Ct., Kings Cty., March 1, 2010).  "It is well settled that the

essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered." Sperry v. Crompton Corp., 8 N.Y. 3d 204 (2007).  Unjust enrichment "rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another . . . The general rule is that the plaintiff must have suffered a loss and an action not based upon loss is not restitutionary." State v. Barclays Bank of New York, 76 N.Y.2d 533, 540-541 (1990)(interior quotation marks and citation omitted); see also Old Republic Natl. Title Ins. Co. v. Luft, 52 AD 3d 491, 491-92  (2d Dept. 2008).[18] Under New York law, however,  "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.'" Conocophillips v. 261 East Merrick Road Corp., 428 F. Supp.2d 111, 127 (E.D.N.Y.  2006)(interior quotation marks and citation omitted); see also City of Yonkers v. Otis Elevator Co., 844 F.2d 42, 48 (2d Cir. 1988).[19]

As Security Mutual seems to acknowledge, the Worksite General Agent's Contract does not govern the use of Plaintiff's copyright protected and trade secret information and proprietary business methods.  Therefore, the New York rule would not apply to bar the unjust enrichment claim.  Accordingly, Security Mutual's motion on this ground is denied.

### 6.  Tortious Interference with Business Relationships and Prospects

Plaintiffs' Seventh Cause of Action alleges a claim of Tortious Interference with

---

[18](The elements required for unjust enrichment are "(1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.")

[19](relief under quasi-contractual theories "is unavailable where an express contract covers the subject matter")

Business Relationships and Prospects against Security Mutual.  In this regard, Plaintiffs

allege that Security Mutual "engaged in post-agreement conduct which repudiated

Plaintiffs' interest in the joint venture[20] and actually and constructively interfered with"

Plaintiffs' existing and prospective contractual business relationships.  Am. Compl.  ¶

120.[21]  Security Mutual argues that the claim fails both as a matter of fact and law.

To state a claim for tortious interference with prospective economic advantage in

New York, Plaintiff must allege that "(1) it had a business relationship with a third party; (2)

the defendant knew of that relationship and intentionally interfered with it; (3) the

defendant acted solely out of malice, or used dishonest, unfair, or improper means; and

(4) the defendant's interference caused injury to the relationship." Kirch v. Liberty Media

Corp., 449 F.3d 388, 400 (2d Cir. 2006)(citation omitted).   "[M]ere suspicions are

inadequate to support a claim for tortious interference with business relations." Scutti

Enters. v. Park Place Entm't Corp., 322 F.3d 211, 217 (2d Cir.2003) (citing Nadel v.

Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir.2000)).

Security Mutual argues that each of the business relationships cited by Plaintiffs in

the Amended Complaint failed either before or after Security Mutual's involvement with

Plaintiffs and for reasons wholly unrelated to any action or statement by Security Mutual.

Similarly, Security Mutual argues that any prospective business relationships failed to

---

[20]Plaintiffs assert that the collaboration was an economic joint venture whereby the parties intended to join forces and share expenses and profits. Security Mutual asserts that it was not a joint venture but merely a contractor/subcontractor agreement as spelled out in the Worksite General Agent's Contract.

[21] The Amended Complaint asserts that Security Mutual interfered with actual or prospective relationships with Lowe's, Call Solutions, Inc., Allstate, and CarQuest.  Allstate and American Heritage are used interchangeably in the parties' papers.

come to fruition for reasons unrelated to Security Mutual's conduct.

> Plaintiffs counter:
>
> First, it is undisputed that [Security Mutual's Executive Vice President] Richard Grady attempted numerous times to interfere with Member Services contractual relationship with PACU, calling and writing [PACU's President] Tom Welch on more than one occasion to try to cut Member Services out as the agent on Lowe's account. See Welch Tr. at 96. 127-28; Defs. Ex. 35. This interference took place despite the existence of an agreement between Member Services and Security Mutual that recognized Member Services contractual right to serve as the agent to Lowe's.
>
> Second, Security Mutual and [Schmitt-Sussman] clearly concluded prior to August of 2004, to deny Member Services the ability to sell Security Mutual product to Lowe's employees in New York; a clear violation of Member Services' contractual rights. Ex. Q.  Moreover, there is reason to believe that Member Services' inability to sell a life insurance product to customers in New York may have contributed to PACU's eventual dissatisfaction with Member Services, and Lowe's eventual dissatisfaction with PACU. See Welch Tr. at 100 (Lowe's' was putting pressure on Member Services to service New York and the Northeast.  Further, there is a reasonable inference given Security Mutual's immediate collusion with [Schmitt-Sussman] (and its desire to get Lowe's for itself) that it deliberately gave Member Services a bad product so that Member Services would fail in its promise to deliver call center coverage to Lowe's in 2003. See Welch Tr. at 96 (Member Services had problems with Security Mutual's program that was affecting sales); at 98 (business dropped off because of the call center and the huge amount of business); and 101 (attributes part of the problem with the Lowe's decline with the problem at the call center); at 110 (problem with the "slowness of the Security Mutual insurance application" remained a problem throughout the relationship with Security Mutual).

Pl. MOL p. 28.

Plaintiffs have failed to address or rebut Security Mutual's evidence establishing that Member Services's relationship with American Heritage failed because of the serious premium drafting problems; that Member Services's was successful in selling PACU memberships and Trustmark's life insurance product after the relationship with Security

27

Mutual ended; and that Member Services's lost the Lowe's and PACU business well after the relationship with Security mutual ended for reasons having nothing to do with Security Mutual.  Plaintiffs' evidence is insufficient for a reasonable fact finder to conclude that Security Mutual's actions caused injury to the relationships to which Plaintiffs cite. Accordingly, the motion to dismiss this claim is granted.

### 7.  Common Law Unfair Competition

Plaintiffs assert in the Eighth Cause of Action that Security Mutual, Archway, and Schmitt-Sussman "have utilized and continue to utilize Plaintiffs' intellectual property in order to obtain an unfair advantage over Plaintiff [Member Services]."  Am. Compl. ¶123. Security Mutual argues that the claim must be dismissed because it is derivative of the trade secret misappropriation claim and "[a]s Plaintiffs' trade secrets claim must fail, so must their unfair competition claim."  Sec. Mut. MOL p. 28.  However, the trade secret misappropriation claim has not been dismissed.  Further, "even where the information taken would not otherwise qualify as a trade secret, the unauthorized physical taking and exploitation of internal company documents for use in a competitor's business constitutes unfair competition." Innovative Networks, Inc. v. Satellite Airlines Ticketing Centers, Inc., 871 F. Supp. 709, 730 (S.D.N.Y. 1995). Therefore, the motion on this ground is denied.

### 8.  Fraudulent Misrepresentation

Plaintiffs assert in the Ninth Cause of Action that Defendants engaged in fraudulent misrepresentations and omissions by failing to disclose to Member Services that Security Mutual had entered an agreement in which Schmitt-Sussman was the exclusive general agent for Security Mutual with respect to life insurance products and credit union sales.

Plaintiffs contend that Security Mutual fraudulently omitted this information to induce Member Services to disclose its "copyright protected and trade secret information."  Am. Compl ¶¶ 126, 127.  Plaintiffs further assert that Security Mutual and Archway "misrepresented their intentions . . . to enter into a joint venture" with Member Services and, instead, intended "to misappropriate Plaintiff's proprietary business methods and trade secrets for its own profits for the benefit of [Schmitt-Susman]."  Id. ¶ 129.

Under New York law, the five elements of a fraud claim are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to the plaintiff."  Crigger v. Fahnestock & Co., 443 F.3d 230, 234 (2d Cir. 2006); see also Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994);[22] Levin v. Gallery 63 Antiques Corp., 2006 WL 2802008, at * 6 (S.D.N.Y. Sept. 26, 2006).[23]  "The elements of a cause of action for fraud in the inducement are the same as those for fraudulent misrepresentation, namely representation of a material existing fact, falsity, scienter, reliance, and injury."  Twin Holdings of Delaware LLC v. CW Capital, LLC, 26 Misc.3d 1214(A), 906 N.Y.S.2d 784 (Table), 2010 WL 309022, at *9 (N.Y. Sup. Nassau Cty., Jan. 19, 2010)(citing Urstadt Biddle Properties v. Excelsior Realty Corp., 65 AD3d 1135 (2d

---

[22]("To prevail on a fraudulent misrepresentation claim under New York law, . . . a plaintiff must show (1) that [the defendant] made a misrepresentation (2) as to a material fact (3) which was false (4) and known to be false by [the defendant] (5) that was made for the purpose of inducing [the plaintiff] to rely on it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury.")(internal quotation marks and citations omitted).

[23]("To state a claim for fraud under New York law, [Plaintiff] must demonstrate: (i) a representation of material fact; (ii) falsity; (iii) scienter; (iv) reasonable reliance; and (v) injury. To plead fraudulent misrepresentation [Plaintiff] must likewise allege that [it] reasonably relied on false representations made by Defendant[].")(citations omitted).

Dept. 2009)).  "Furthermore, New York courts clearly distinguish between a 'promissory statement as to what will be done in the future,' which gives rise only to a breach of contract claim, and a false 'representation of present fact,' which gives rise to a separable claim of fraudulent inducement."  <u>Topps Co., Inc. v. Cadbury Stani S.A.I.C.</u>, 380 F. Supp.2d 250, 266 (S.D.N.Y. 2005).

Security Mutual argues that "[t]he undisputed and undisputable facts negate this cause of action."  Sec. Mut. MOL p. 28.  In this regard, Security Mutual contends that, in mid-Janaury 2003,  Roger Banks learned of Schmitt-Sussman's involvement with Security Mutual, expressed moderate concern about the relationship and asked for a non-compete agreement (which was never executed), but continued the relationship nonetheless.  <u>Id.</u> p 29 (citing R. Banks Tr. pp. 175, 191).   Security Mutual further contends that Member Services "had no 'trade secrets' that were misappropriated in any way by the Security Mutual defendants or Schmitt-Sussman and that [Member Service's] business difficulties resulted from reasons entirely unrelated to Security Mutual and Schmitt-Sussman."  <u>Id.</u> p. 30.

Member Services counters by pointing to evidence indicating that Banks only learned of the existence of Schmitt-Sussman in mid-January (after Member Services and Security Mutual began exchanging information), but "[i]It was not until a few months into the relationship that he learned of the exclusive nature of the relationship" between Security Mutual and Schmitt-Sussman.  Mem. Ser. MOL pp. 29-30 (citing R. Banks Tr. at 173-76).  By then, the information about Member Services's business model and computer programs had been disclosed.

30

Viewing the evidence in the light most favorable to Member Services, a question of fact exists as to whether Security Mutual made a material omission of fact regarding its exclusive relationship Schmitt-Sussman which, if it had been made, would have dissuaded Member Services from disclosing its alleged proprietary information.  Similarly, a question of fact exits at to whether Member Services was damaged as a result of the disclosure of the computer software and code information.  The motion on this ground is denied.[24]

### c.  Member Services' Motion for Partial Summary Judgement [dkt. # 226]

Member Services moves for partial summary judgment on three issues:

**First,** Member Services seeks an order finding that its business model, together with the implementing business rules, programming and code, if proven to exist at trial, are "trade secrets" as matter of law, for purposes of Member Services' claim of misappropriation of trade secrets.  Alternatively, Member Services seeks a Declaration that, as a matter of law, the information acknowledged in the Parties' contract to be proprietary and owned by Member Services, be deemed a trade secret as a matter of law.

**Second,** Member Services seeks an order finding that a contract exists between Member Services, Security Mutual and Archway consisting of at least: (i) a January 20, 2003 Letter of Intent; (ii) a January 21, 2003 Worksite General Agent's Contract; (iii) a February 28, 2003 Letter of Understanding; and (iv) a Non-Disclosure and Confidentiality Agreement effective January 17, 2003.

---

[24]Member Services also notes that Security Mutual failed to initially address the claim that Security Mutual induced Plaintiffs to disclose computer software and codes by fraudulently representing that it intended to enter a joint venture. Although Defendants argue in their Reply brief that "the component of [Member Services's] fraud claim to the effect that Security Mutual never intended to enter into a meaningful business relationship is not actionable" as a matter of law, Sec. Mut. Reply MOL p. 15, the Court refrains from adjudicating this issue because there has no response from Member Services on the issue raised in reply. The parties may address this legal issue at the commencement of trial in an attempt to narrow the issues.

**Third,** Member Services seeks summary judgment on its Third Claim seeking a declaration that Security Mutual committed fraud on the U.S. Copyright Office when it knowingly and fraudulently represented in two copyright filings that a program it called "*CU@Work*" was an original work of Security Mutual. Upon this declaration, Plaintiffs further request that the Court invalidate these copyright registrations on this fraud.

Mem. Serv. MOL p. 1.  Security Mutual has opposed the motion on each ground.

## 1.  Declaration of Trade Secret

Member Services' first ground for relief seeks, in essence, a declaratory judgment on one element of one of its claims.  "The plain language of Federal Rule of Civil Procedure 56 indicates that it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues." Securities and Exchange Commission v. Thrasher, 152 F. Supp.2d 291, 295 (S.D.N.Y. 2001).

Although Rule 56 allows interlocutory motions to determine liability alone, partial summary judgment motions that fail to fully resolve even that issue for any given cause of action are disfavored. See United States v. American International Group, Inc., No. 94 Civ. 7621, 1997 WL 66786, at *2-3 (S.D.N.Y. Feb. 14, 1997).  In general, "it is not appropriate to use summary judgment as a vehicle for fragmented adjudication of non-determinative issues" because such motions waste judicial resources. Securities and Exchange Commission v. Thrasher, 152 F. Supp.2d 291, 295-96 & n. 2 (S.D.N.Y.2001); 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure ("Wright & Miller" ) § 2737 (3d ed.1998).  It is true that a court may, under Rule 56(d), narrow the issues for trial by determining that certain facts are undisputed "when it would be practicable to save time and expense and to simplify the trial."  Wright & Miller § 2737. This provision however, is merely intended to salvage some constructive result from the effort expended on a proper summary judgment motion that is ultimately denied; it does not authorize a litigant to seek a ruling at the outset only on subsidiary issues. See Gucci America, Inc. v. Ashley Reed Trading, Inc., No. 00 Civ. 6041, 2003 WL 22327162, at *8 (S.D.N.Y. Oct. 10, 2003); Thrasher, 152 F. Supp.2d at 297 (finding that Rule 56 does not provide a mechanism for litigants to request summary judgment on fragment of single claim).

<u>Melini v. 71st Lexington Corp.</u>, 2009 WL 413608, at *3 (S.D.N.Y. Feb. 13, 2009).

Other courts have reached the same conclusion when examining Rule 56 in similar circumstances. <u>See</u> <u>Rapid Funding Group, Inc. v. Keybank Nat. Ass'n</u>, 2009 WL 2878545, at *15 (D. Or. Sept. 2, 2009);[25] <u>G & C Auto Body Inc. v. Geico General Ins. Co.</u>, 2007 WL 4350909, at *1 (N.D. Cal. Dec. 12, 2007);[26] <u>City of Wichita v. United States Gypsum Co.</u>, 828 F. Supp. 851, 869 (D. Kan. 1993),[27] <u>rev'd on other grounds</u>, 72 F.3d 1491 (10th Cir.1996); <u>Capitol Records, Inc. v. Progress Record Distributing, Inc.</u>, 106 F.R.D. 25, 28 (N.D.Ill.1985);[28] <u>Arado v. General Fire Extinguisher Corp.</u>, 626 F. Supp. 506, 509 (N.D.Ill.1985);[29] <u>but see</u> <u>Barker v. Norman</u>, 651 F.2d 1107, 1123 (5th Cir.1981);[30] <u>McDonnell v. Cardiothoracic & Vascular Surgical Associates, Inc.</u>, 2004 WL 1234138 (S.D.Oh. May 27, 2004).

The Court agrees with those courts that have rejected Rule 56's application on motions seeking adjudication of only a single element of a claim. The use of Rule 56 to resolve an element of a claim is wasteful of judicial resources in situations, such as this

---

[25] ("The implication of Rule 56(d)(2) is that summary judgment may not properly issue as to mere elements of liability. I therefore concur with the courts concluding that, other than determining the preclusive effect of prior proceedings, piecemeal adjudication of less than all of the elements of liability for a single cause of action is not permitted under Rule 56.")

[26] ("[E]ach [motion] seek[s] to resolve less than an entire claim at issue in the case. The Court regards these motions to resolve sub-issues of claims as improper under Federal Rule of Civil Procedure 56(d).")

[27] ("Rule 56(c) authorizes only the entry of judgments on claims, not single issues or elements that are not dispositive of judgment on those claims.")

[28] (To move for partial summary judgment as to only a subset of the elements of liability on a claim was a "fatal defect" that could not be cured by "[f]raming the motion as one for partial summary judgment.")

[29] (summary judgment motion by plaintiff was improper because it requested disposition of elements of a claim rather than judgment on the claim as a whole)

[30] (summary judgment may be appropriate as to issues as well as claims)

one, where there is a dispute on the remaining issues which will necessarily be resolved at trial.  Because the instant motion seeks only a resolution of one element of Plaintiffs' claim, the motion must be denied.

Further, the motion seeks adjudication of the element based upon the facts that *might* be proven at trial.   Indeed, Security Mutual contests, among other things, whether Member Services had the capability before the collaboration to actually accomplish many of the functions and processes that it claims constitute its "trade secret."  Resolution of this factual issue in Security Mutual's favor would defeat the trade secret claim which, in turn, would render the sought-after declaration "strictly advisory."  College Standard Magazine v. Student Ass'n of State of University of New York at Albany, 610 F. 3d 33, 34 (2d Cir. 2010)(*per curiam*).  Accordingly, the motion must also be denied because it asks the Court to render an impermissible advisory opinion. See New York City Health and Hospitals Corp. v. Blum, 678 F.2d 392, 397 (2d Cir. 1982).

### 2.     Declaration of Contract Documents

Member Services' second motion also seeks resolution of only a certain issue, not of an entire claim.  As evidenced by Security Mutual's opposition, Security Mutual disputes the factual basis for Plaintiffs' assertion that an agreement existed between the parties on any matters beyond that set forth in the January 21, 2003 Worksite General Agent's Contract.[31]  Further, Member Services "contends that the Parties' Agreement includes certain verbal representations, but it does not seek a ruling as to the binding nature of those representations at this time, but rather will prove their existence at trial." Mem. Serv.

---

[31] Other than on the Worksite General Agent's Contract, Security Mutual contends that there was no meeting of the minds with regard to the other documents such to form a contract.

34

MOL, p. 16, n. 8.  Thus, to determine whether there was a "manifestation of mutual assent

sufficiently definite to assure that the parties are truly in agreement with respect to all

material terms" of the purported agreement, the matter must be presented to the jury

anyway. See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc., 487 F.3d 89, 95 (2d

Cir. 2007).[32]   For the reasons discussed above, Member Services's second motion is

denied as an improper attempt to use Rule 56 to obtain a fragmented resolution of a

single issue.

### 3.    Declaration of Invalidity of Security Mutual's Copyright

Member Services' third motion seeks a declaration that Security Mutual's copyrights

for the source code contained in the new version of the *CU@Work* program are invalid

because they were based on the same works of authorship as covered by Member

Service's copyright for the original version of *CU@Work*. See Syntek Semiconductor Co.,

Ltd. v. Microchip Technology Inc., 307 F.3d 775, 779 (9th Cir. 2002). [33]  This motion seeks

judgment on Plaintiffs' Third Cause of Action.  See Am. Compl. ¶¶ 92-107.

In opposition, Security Mutual argues that "there is no private cause of action under

_____

[32]("To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." (quoting Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp., 93 N.Y.2d 584, 589, 693 N.Y.S.2d 857 (1999))

[33]

Computer programs are works of authorship entitled to protection under the Copyright Act. 17 U.S.C. § 101, 102. The Copyright Act defines a computer program as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. Computer programs can be expressed in either source code or object code. "Source code is the computer program code as the programmer writes it, using a particular programming language." Compendium of Copyright Office Practices, § 321.01. Source code is a high level language that people can readily understand. "Object code is the representation of the program in machine language [binary] ... which the computer executes." Id. at § 321.02.

Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc., 307 F.3d 775, 779 (9th Cir. 2002).

the Copyright Act, 17 U.S.C. § 101 *et seq*. to void or invalidate a federal copyright

registration.  As a result, this Court lacks subject matter jurisdiction to decide this claim."

Sec. Mut. MOL p. 23 (citing  Syntek Semiconductor Co., Ltd. v. Microchip Tech. Inc., 285

F.3d 857, 864 (9th Cir. 2002), amended, 307 F.3d 775 (9th Cir. 2002)).  However, Syntek

Semiconductor did not hold that a federal district court lacks jurisdiction over a claim such

as the one asserted in Plaintiffs' Third Cause of Action, but rather held that a court should

consider the doctrine of primary jurisdiction in determining whether to stay the federal

action and remand the copyright invalidity claim to the United States Copyright Office. See

Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc., 307 F.3d 775, 779 (9th Cir.

2002). To the extent that Security Mutual's argument can be interpreted as a request to

apply the doctrine, the request is denied.

> The doctrine of primary jurisdiction is concerned with "promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." United States v. W. Pac. R.R. Co., 352 U.S. 59, 63, 77 S. Ct. 161, 1 L. Ed.2d 126 (1956). The doctrine's central aim is to allocate initial decisionmaking responsibility between courts and agencies and to ensure that they "do not work at cross-purposes." Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp., 84 F.3d 91, 97 (2d Cir .1996). "Whether there should be judicial forbearance hinges therefore on the authority Congress delegated to the agency in the legislative scheme." Golden Hill Paugussett Tribe of Indians v. Weicker, 39 F.3d 51, 59 (2d Cir. 1994) (citing Ricci v. Chicago Mercantile Exch., 409 U.S. 289, 304, 93 S. Ct. 573, 34 L.Ed.2d 525 (1973)); see also Gen. Elec. Co. v. MV Nedlloyd, 817 F.2d 1022, 1026 (2d Cir. 1987) (noting that the doctrine applies "when Congress has entrusted the regulation of certain subject matter under a statute to an administrative agency"). Recourse to the doctrine of primary jurisdiction is thus appropriate "whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." W. Pac. R.R. Co., 352 U.S. at 64, 77 S. Ct. 161.

Ellis v. Tribune Television Co., 443 F.3d 71, 81 (2d Cir. 2006).

In determining whether to apply the Doctrine of Primary Jurisdiction, courts generally focus on four factors:

> (1) whether the question at issue is within the conventional experience of judges or whether it involves technical or policy considerations within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

Ellis, 443 F.3d at 82-83 (citations omitted).   "[T]he court must also balance the advantages of applying the doctrine against the potential costs resulting from complications and delay in the administrative proceedings." Id. at 83 (citation omitted).

Inasmuch as: (1) neither party has argued the merits of a primary jurisdiction determination; (2) the factual issues in the copyright invalidity claim will be virtually the same as those to be litigated in the copyright infringement claim;  (3) determining the origin, function, and scope of the disputed source codes does not appear to require technical considerations solely within the particular field of expertise of the Copyright Office; (4) this case has been pending in this Court for several years and will be, upon that resolution of the motions addressed herein, trial ready; and (5) there is no indication that petition has been filed in the U.S. Copyright Office to invalidate the challenged copyrights, the Court declines to invoke the doctrine of primary jurisdiction for the copyright invalidity claim.

Turning to the merits of the motion, Security Mutual contends that the source codes

covered by its copyrights are original works created by its computer programing team. This factual dispute defeats Plaintiffs' right to summary judgment on the copyright invalidity claim.  Therefore, the motion in this regard is denied.

### d.    Schmitt-Sussman's Motion for Summary Judgment [dkt. # 216]

Schmitt-Sussman moves for summary judgment seeking to dismiss the four claims brought against it - trade secret misappropriation; copyright infringement; unjust enrichment; and fraudulent misrepresentation. Member Services opposes the motion.

### 1.    Trade Secret Misappropriation

Schmitt-Sussman asserts that the Trade Secret Misappropriation claim must be dismissed because it was merely a "front end user" of the computer programs supplied to it by Security Mutual.  It contends that that there exists no evidence that Schmitt-Sussman used any trade secret in breach of an agreement, confidence, or duty, or that it played any role, let alone an improper role, in obtaining Plaintiffs' purported trade secret. See Integrated Cash Management, 920 F.2d at 173.[34]  Member Services responds by asserting that Schmitt-Sussman conspired with Security Mutual to steal Member Services' purported trade secret.

> Under New York law, which governs [Plaintiffs'] cause of action for the misappropriation of its trade secrets, a plaintiff may, on a theory of concerted action, recover damages from a defendant that was one of a group of entities if at least one of those entities committed a tort in pursuance of a common plan or design, and the defendant knew the wrongful nature of the primary actor's conduct and intended to assist in or profit from the commission of the tort.  Such liability may also be imposed on one who

---

[34](To state a claim for trade secret misappropriation under New York law, the plaintiff must establish "(1) it possessed a trade secret; and (2) [defendants are] using that trade secret in breach of an agreement, confidence, or duty, or as the result of discovery by improper means.").

encourages the commission of a tort or who, knowing of a tort committed for its benefit, ratifies it.

In re Dana Corp., 574 F.3d 129, 152-53 (2d Cir. 2009)(citations omitted).

Although Member Services has pointed to evidence indicating that Schmitt-Sussman used Security Mutual's post-January 2003 revised computer program and that Schmitt-Sussman desired to obtain the Lowe's business, Member Services offers nothing more than surmise and speculation that Schmitt-Sussman "knew the wrongful nature of [Security Mutual's] conduct and intended to assist in or profit from the commission of the tort."  Similarly, Member Services relies upon mere conjecture in attempting to establish that Schmitt-Sussman "encouraged the commission of [the tort of trade secret misappropriation] or that Schmitt-Sussman, "knowing of a tort committed for its benefit," ratified it.  Plaintiffs' surmise, speculation, and conjecture is insufficient to withstand summary judgment.   Therefore, the motion in this regard is granted.

## 2.      Copyright Infringement Claim

Schmitt-Sussman also moves to dismiss the copyright infringement claim brought against it.  Although there is evidence indicating that Schmitt-Sussman used Security Mutual's revised computer programs and that the revised programs may have infringed the copyright covering the source code for the original *CU@Work* program, there is no evidence that Schmitt-Sussman copied the programs, created any programs, or used any source code in the creation of any infringing work.  Thus, the claim fails as matter of law. See Peter F. Gaito Architecture, LLC v. Simone Development Corp., 602 F.3d 57, 63 (2d

Cir. 2010).[35] Defendant's motion is granted in this regard and the copyright infringement claim is dismissed against Schmitt-Sussman.

### 3.   Unjust Enrichment Claim

Schmitt-Sussman argues that the unjust enrichment claim must be dismissed because (1) the claim is predicated upon Plaintiffs' position that "defendants" misappropriated their trade secrets and (2)  the trade secret misappropriation claim is deficient against all defendants.

Although the two claims are based upon the alleged misappropriation of Member Services' purported trade secret computer program and business model, the unjust enrichment claim could succeed even if the trade secret misappropriation claim does not. However, even assuming that the misappropriation claim is successful against Security Mutual, there is insufficient evidence to support the unjust enrichment claim against Schmitt-Sussman.

Based upon the evidence in the record, it could reasonably be concluded that Schmitt-Sussman was aware that Security Mutual's revised computer software programs were modeled on Plaintiffs' *CU@Work*  program, and that Schmitt-Sussman used the revised Security Mutual programs to compete against Member Services.  However, there is insufficient evidence for a fact finder to conclude that Schmitt-Sussman had any involvement with Security Mutual's creation of its revised programs,  or that Schmitt-Sussman directed or encouraged Security Mutual to collaborate with Member Services so

---

[35] ("In order to establish a claim of copyright infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's.")(emphasis added, internal quotation marks and citation omitted)

that it could misappropriate Member Services's computer program for Schmitt-Sussman's benefit.  Further, and for the reasons discussed above with regard to Security Mutual's motion to dismiss the tortious interference claim, there is insufficient evidence that Member Services was damaged by Schmitt-Sussman's use of Security Mutual's revised computer programs.   Accordingly, the motion on this ground is granted and the unjust enrichment claim against Schmitt-Sussman is dismissed.

### 4.        Unfair Competition Claim

Schmitt-Sussman argues that the unfair competition claim must be dismissed because, like the unjust enrichment claim, the claim is predicated upon Plaintiffs' deficient trade secret misappropriation claim.  Again, the two claims are not dependent on each other, and one may succeed even if the other does not.  However, like with the unjust enrichment claim, Plaintiffs have failed to establish sufficient facts to maintain the claim against Schmitt-Sussman.  "It is well settled that the gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another . . . by exploitation of proprietary information or trade secrets."  A & G Research, Inc. v. GC Metrics, Inc., 19 Misc.3d 1136(A), 862 N.Y.S.2d 806 (Table), 2008 WL 2150110, at *23 (N.Y.Sup. Ct., West. Cty.,  May 21, 2008) (citations omitted).  As discussed above with regard to the trade secret misappropriation claim, there is insufficient evidence for a reasonable fact finder to conclude that Schmitt-Sussman, either directly or in concert with Security Mutual, engaged in any bad faith misappropriation of a commercial advantage belonging to Member Services.  Accordingly, the claim against Schmitt-Sussman is dismissed.

41

### e.    Motion to Exclude Testimony of Gary L. Tinkel [dkt. # 212]

Security Mutual identified and disclosed Gary L. Tinkel as its expert under Fed. R. Civ. P. 26 to testify to issues surrounding the origin and development of Security Mutual's source code.  Plaintiffs move to exclude Mr. Tinkel's testimony pursuant to Fed. R. Evid. 702.

### 1.    Standard of Review

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the United States Supreme Court explained that the Federal Rules of Evidence ("FRE") are satisfied and expert evidence admissible where "the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." Id. at 592-93.  District Courts have a "gatekeeping" role under Federal Rule of Evidence 702 and are charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S. at 597). The Court must determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered."  Amorgianos, 303 F.3d at 265 (internal quotation marks omitted).  This inquiry involves considering whether (1) the testimony is grounded on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid. 702.  The inquiry is fluid and will vary from case to case.

In assessing whether the expert's knowledge is based upon "scientific" or technical principles and methodology that will assist the trier of fact, the Court's "focus, of course,

42

must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595.  Accordingly, "gaps or inconsistencies" in an expert's reasoning, or arguments that an expert's conclusions are wrong, "go to the weight of the evidence, not to its admissibility."  Campbell v. Metropolitan Property and Cas. Ins. Co., 239 F.3d 179, 186 (2d Cir. 2001).  Likewise, disputes regarding the nature and strength of an expert's credentials, an expert's use or application of his methodology, or the existence or number of supporting authorities for an expert's opinion, go to the weight, not the admissibility of his testimony. McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1044 (2d Cir. 1995).  As the Supreme Court has noted, "[v]igorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking an expert who has applied a valid methodology in reaching his or her opinions."  Daubert, 509 U.S. at 596.

### 2.    First Ground

Plaintiffs' first ground on this motion is that Mr. Tinkel's analysis "is based on insufficient facts and unreliable methodology rendering his testimony inadmissible under Fed. R. Evid. 702."   In this regard, Plaintiffs note that Mr. Tinkle never operated or observed the December 2002 version of Security Mutual's software in action, but instead evaluated computer code stored in a system called "Visual Source Safe" or VSS.[36] Plaintiffs argue that because Mr. Tinkle did not evaluate the software in action, he is unable to testify about the functionality of Security Mutual's pre-2003 software or the

---

[36]VSS is an electronic repository that contains numerous computer code components of software programs in an unassembled, unintegrated, and inoperable form. See Tinkle Dep. at pp. 10-11; Tinkel Rep. pp.10-11, 45-46.

changes that occurred to the software during the three months that Member Services

disclosed information about its program.

> Plaintiffs also assert that
>
> in evaluating the state of Member Services' software development, to
> purportedly determine whether the claimed propriety features existed prior to
> the disclosure to Security Mutual in 2003, Mr. Tinkel conveniently evaluates
> only that portion of the code for one piece of the process - the paper
> enrollment component – ignoring the additional, vast body of proprietary
> information related to the balance of the overall process, provided to Security
> Mutual in 2003.

Pl. MOL p. 6.  Plaintiffs argue that Mr. Tinkel's opinions about the functionality of  pre-2003

software programs must be disregarded because he did not evaluate all proprietary

information provided to Security Mutual - namely, he failed to consider the *SEGSoft*

program that was disclosed to Security Mutual in 2003.

Security Mutual counters that Mr. Tinkle, whose qualifications were not challenged,

is highly qualified on the subject matter of computer source code and, more particularly,

has significant experience with computer programming in the insurance and banking

fields.  According to Security Mutual: "Mr. Tinkel can demonstrate that he has enough

expertise in the field to review computer source code and opine on what would happen

when that source code was actually executed without himself having to build a working

program from the source code.  Indeed, much of the workings of computer programs are

invisible when the programs are operated, meaning that any exploration of the

functionality of the programs must occur at the source code level rather than by viewing

44

what happens when the source code is executed." Sec. Mut. MOL pp. 3-4. [37]

Security Mutual argues that "Mr. Tinkel's comprehensive review of the relevant evidence in this case included all of Security Mutual's pre-2003 source code, including the source code as it existed between September 2002 and December 2002. Tinkel Report at 3-4.  Mr. Tinkel did not have to execute the source code to see what it would do – he is an expert in the field who is capable of reading the source code to figure out what it would do when it was executed." Id. pp. 4-5.  "Based on his review of the source code archive/library, Mr. Tinkel determined that the source code included the ability to accomplish many of the functions that [Member Services] alleged were later misappropriated from [Member Services] in 2003 and provided an exhaustive analysis of each function and the specific source code from Security Mutual's source code archive that contained those functions prior to 2003."  Id. p. 5.

As to the argument that Mr. Tingle ignored certain aspects of Plaintiffs' program, Security Mutual notes that Member Service "has not asserted as trade secrets any of the things that it accuses Mr. Tinkel of ignoring, so it is unclear why he should have considered those items in the first place.  Second, and more importantly, [Member Services] failed to cite a single line of testimony where Mr. Tinkel conceded that he did not review the source code for these things." Id. p. 6.  As to the *SEGSoft* program, Security Mutual asserts that "[t]here is not a single shred of evidence that Security Mutual

---

[37] Further, Security Mutual argues that it need not prove that Security Mutual had a working software program in 2002, but rather only establish that it was aware of the alleged "trade secret" before it collaborated with Member Services.  "Security Mutual's prior knowledge means that the information was not a secret and therefore cannot constitute a protectable trade secret.  Stated another way, it simply does not matter whether Security Mutual had a 'production ready' computer program as long as Security Mutual previously knew how to do whatever [Member Services] claims was later misappropriated."  Id. Sec. Mut. MOL  4.

was provided with the source code for the *SEGSoft* program."

The Court finds that these arguments go to the weight of Mr. Tingel's conclusions, and not the admissibility of his testimony under Fed. R. Evid. 702.  See Campbell, 239 F.3d at 186;  McCullock, 61 F.3d at 1044.[38]  Therefore, this portion of the motion is denied. Plaintiffs may explore these issues at trial.

### 3.   Second Ground

Plaintiffs' second ground is that "Mr. Tinkel's testimony is inadmissible because his expert conclusions are not based on specialized technical knowledge, are not presented in a manner that would be helpful to the jury, and invade the province of the jury and Court by making bald conclusions based on second-hand knowledge." Pl. MOL p. 19.  In this regard, Plaintiffs contend that Mr. Tinkel relied upon Security Mutual's representations about the pre-2003 functionality of its program, and relied on Security Mutual's representations as to where certain functions existed in Security Mutual's pre-2003 source codes.  Member Services also contends that "Mr. Tinkel's report does not address technical questions that may be difficult for a juror to comprehend. Rather, it contains arguments and conclusion better suited for inclusion in a legal brief authored by an attorney."

Security Mutual counters that Mr. Tinkle did not rely on representations by others, but testified that "by looking at some of the dates of the program, I was able to determine that they were done, a lot of the source code was developed in the 2002 time frame." Ex.

---

[38] ("[d]isputes as to . . . faults in [expert's] use of [particular scientific analysis] as a methodology . . . go to the weight, not the admissibility, of his testimony.")

C, Tinkel Tr. at 28-30.  Mr. Tinkel also testified that the source codes were found in

Security Mutual's archive program which is a widely used product whose dates are

deemed to be very reliable. Ex. C, Tinkel Tr. at  37.  Security Mutual asserts  that Mr.

Tinkel did not rely upon the representations of others with regard to the functionality of the

source code, but merely asked Security Mutual to direct him to the relevant parts of the

source code so he could review and analyze the source codes himself.   See Sec. Mut.

MOL p. 13.[39]  Security Mutual also disagrees that Mr. Tinkel's report amounts simply to

legal conclusions.

    The fact that an expert witness's report may contain legal conclusions does not

mean that the entirety of the expert's testimony must be precluded. An expert cannot offer

legal conclusions, and Plaintiffs' counsel is free to object to any such testimony should it

be offered at trial.  Similarly, expert witnesses must generally testify based upon personal

knowledge gained from their investigation.  Although an expert may rely on hearsay in

forming his expert opinions, "[t]he expert may not, however, simply transmit that hearsay

to the jury. Instead, the expert must form his own opinions by applying his extensive

experience and a reliable methodology to the inadmissible materials. Otherwise, the

expert is simply repeating hearsay evidence without applying any expertise whatsoever."

United States v. Mejia, 545 F.3d 179, 197-98 (2d Cir. 2008) (internal quotation marks and

citations omitted).  The fact that someone may have directed the expert to a specific code,

---

[39] ("It is remarkable that [Member Services] suggests that Mr. Tinkel did not consider the specific
functionality represented by the source code as his report identifies and describes the functions of specific
source code files over the course of seventeen pages. In fact, as part of his expert report, Mr. Tinkel
specifically cited to and included copies of the source code files in which they existed in 2002 as physical
exhibits to his report, which amounted to more than 1,000 pages of source code drawn from Security
Mutual's source code archive.")(citations omitted)

or made have even represented the functionality of a code, does not mean that the expert

will be precluded from testifying.  At trial, Plaintiffs' counsel is free to object to testimony

not based upon the proper foundation, and counsel may attack any opinions that are not

formulated upon the expert's personal knowledge.   The motion in this regard is denied.

### 4.   Third Ground

Plaintiff's third ground is that "[t]he arguments and conclusions stated in the

'background' section of Tinkel's report must be excluded from testimony" because they

"amount to nothing more than a legal and factual argument based on disputed matters."

Pl. MOL p. 22.   As discussed above, Plaintiffs can address this argument at the time of

trial if the objected-to testimony is offered.  The motion in this regard is denied.

### 5.   Fourth Ground

Plaintiffs' fourth ground in the motion is that "Mr. Tinkel's testimony based on his

perusal of the '*WayBackMachine*' website is not based on scientific or technical

knowledge and must be excluded."  Pl. MOL p. 22.  Apparently, the *WayBackMachine* is

an Internet website that archives internet web pages that existed at past times. See

Internet Archive WayBackMachine, http://www.archive.org/web/web.php (accessed

09/01/10).[40]  Security Mutual asserts that "Mr. Tinkel obtained and reviewed documents

from the [pre-2003] time frame that disclosed other conventional computer programs in

---

[40]It states on this web page:

**About the Wayback Machine**: Browse through over 150 billion web pages archived from 1996 to a few months ago. To start surfing the Wayback, type in the web address of a site or page where you would like to start, and press enter. Then select from the archived dates available. The resulting pages point to other archived pages at as close a date as possible. Keyword searching is not currently supported.

the industry that were capable of performing many of the same basic functions that MSI claims to be its trade secrets.  Tinkel Report at 25-31.  [Member Services] offers no explanation of why Mr. Tinkel's opinions on the state of art of comparable insurance programs in 2002 is inadmissible other than the fact that they are not 'scientific.'"  Sec. Mut. MOL p. 19.

The Internet has become a source of reliable information both for courts and experts.  See Alfa Corp. v. OAO Alfa Bank, 475 F. Supp.2d 357, 361 (S.D.N.Y. 2007);[41] United States  v.  Paracha, 2006 WL 12768, at * 17-21  (S.D.N.Y. Jan.  03, 2006),[42] aff'd 313 Fed. Appx. 347 (2d Cir. 2008).   Further, Plaintiffs have not demonstrated that the information obtained from the *WayBackMachine* website is unreliable or that experts in the field would not reasonably rely on the data obtained from this website.  See Fed. R. Evid. 703.[43]  Accordingly, the motion to preclude Mr. Tingle from testifying in this regard is denied, but Plaintiffs may renew the argument at trial if Security Mutual is unable to demonstrate the reliability of the information.  See Paracha, 2006 WL 12768, at * 20.[44]

### f.    Motion to Exclude Plaintiffs' Expert Witnesses [dkt. # 233]

Security Mutual moves to preclude the testimony of Member Services' computer

---

[41](" To begin with, it is not clear that internet sources in general, or the ones cited by Mr. Muravnik in particular, are inherently unreliable. Countless contemporary judicial opinions cite internet sources, and many specifically cite *Wikipedia*.")(citations omitted)

[42](qualifying the government's witness, Evan Kohlmann, as an expert on terrorism groups and allowing him to testify based on information obtained from, *inter alia*, internet sources)

[43](permitting reliance upon inadmissible evidence if of a type "reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject")

[44]("The proponent of expert testimony . . . has the burden of showing that the expert's methodology and the application of that methodology in this case are reliable.")(citations omitted)

code and programming expert, Michael R. Elliott; Member Services' computer systems

engineer expert, John Cosgrove; and a witnesses who will purportedly testify to a

"reasonable royalty" damage calculation on the trade secret misappropriation claim,

Michael M. Krieger.   Member Services opposes each aspect of the motion.

### 1.  Michael R. Elliott

As to Mr. Elliott's testimony, Security Mutual asserts that "three fundamental

problems" exist:

> First, Mr. Elliott was incapable of explaining the nature of the trade secrets
> that he supposedly found had been misappropriated by Security Mutual. ....

> Second, Mr. Elliott failed to consider the specific methods or information
> implemented by [Member Services] in its allegedly trade secret business
> process and then compounded this failure by neglecting to consider whether
> Security Mutual had adopted the specific methods used by [Member
> Services]. . . .

> Finally, Mr. Elliott improperly considered [Member Services] source code that
> was not disclosed to Security Mutual, namely, the *SEGSoft* back office
> program used by [Member Services] employees to manually enter
> information from paper copies of membership and insurance applications
> collected by its agents in the field.

Sec. Mut. MOL pp. 3-8.

Security Mutual's first and second grounds to preclude Mr. Elliott's testimony are

based upon Security Mutual's position that Member Services has not sufficiently identified

the "trade secret" that Security Mutual purportedly misappropriated, and, therefore, Mr.

Elliott's proffered testimony about the functionality of the component parts of Member

Services "business model" is irrelevant and improper.  The Court does not agree.

Evidence supporting the functionality of the purported trade secret can come from several witnesses, including lay and expert witnesses.  While Mr. Elliott may not be able to explain how each component part fits into the larger whole, this is ground for cross-examination by Security Mutual to limit the jury's application of Mr. Elliott's conclusions.  It is not a basis for precluding his testimony. The motion to preclude the witness's testimony on these two grounds is denied.  Security Mutual may explore these issue at the time of trial.

The third ground raised by Security Mutual, however, gives the Court substantial pause.  Security Mutual asserts that "the *SEGSoft* program was not properly certified to this Court under Judge Peebles' March 12, 2007 discovery order that required [Member Services] to identify and provide the source code and software which had allegedly been disclosed to Security Mutual and which would be forming the basis for the allegations in this lawsuit."  Sec. Mut. MOL p. 8.  Member Services responds that "[t]his information was, in fact, turned over during discovery, as explained in Member Services' Rule 37 motion and the accompanying responses."  Mem. Serv. p. 11.  In reply, Security Mutual argues that Member Services "cannot circumvent its failure to certify these materials and provide the binding representation of the scope of its allegations by subsequently attempting to produce additional materials in discovery or giving the materials to its expert as 'background' information."  Sec. Mut. Reply MOL p. 6.  In support of this argument, Security Mutual cites to Magistrate Judge Peebles's March 12, 2007 discovery order that provided in pertinent part:

> The materials submitted by plaintiffs must include every piece of information, including codes, software, and other information, which, they maintain, was

51

> conveyed to the defendants during the meetings which occurred in or about
> 2003 in connection with the parties' proposed joint venture and disclosed to
> the defendants at any other point in time up to the date of commencement of
> this suit.  Plaintiffs' submission shall also include the code, all drafts of code,
> and all information regarding the software for its *CU@Work* program.

March 12, 2007 Order [dkt. # 27].

Because this third issue involves a discovery dispute arising under Magistrate

Judge Peebles's order, the Court denies this aspect of the motion with leave to renew at

trial.  The Court refers to Magistrate Judge Peebles the limited issue of determining

whether the *SEGSoft* program was properly certified either by initial disclosure or by some

later disclosure allowed under Magistrate Judge Peebles's discovery order(s).

### 2.    John Cosgrove

John Cosgrove is a computer software engineer who, according to his expert

report, intends to offer his opinion about: (1) the software development history of the

parties; (2) the parties' intent in entering in a relationship in 2003; (3) the reasons why the

parties entered into a relationship in 2003; (4) Member Services's alleged trade secret

technology; and (5) Security Mutual's alleged failure to fulfill alleged contractual

obligations. <u>See</u> Cosgrove Rep.  From reading the report, it is apparent that Mr.

Cosgrove's conclusions are based, in a substantial part, on his review of the parties'

discovery materials and his speculation about the parties' intentions and motives.  Section

1.1 of Mr. Cosgrove's report is illustrative and states that:

> [Security Mutual] identified [Member Services] as a source of critical
> know-how who was in possession of fully integrated automation support
> systems in the specialized field of marketing insurance products in the credit
> union industry. The know-how represented in these specialized [Member
> Services] systems was deemed to be highly valuable to [Security Mutual]

52

> because it solved important business problems which seriously impacted
> profitability of the credit union business for both [Security Mutual] and their
> partner [Schmitt-Sussman].

Cosgrove Rep. at 4.  Other sections of Mr. Cosgrove's report are equally problematic from

the standpoint of providing commentary on the facts of the case, including but not limited

to: Section 1.2 ("[Security Mutual]'s Need for [Member Services]'s Credit Union

Solutions"); Section 1.3 ("Why a Collaborative Development was Necessary to [Security

Mutual]"); Section 1.4 ("Secret Conflict of Interest"); Section 1.5 ("Transferring [Member

Services]'s Business-Methods and Know-how in Credit Union Insurance"); and Section 7

("[Member Services]-[Security Mutual] Project History").  Cosgrove Rep. at 4-7, 16-17.   As

Security Mutual argues, "[t]hese sections of Mr. Cosgrove's report are simply recitations of

[Member Services]'s version of the facts, with Mr. Cosgrove serving as another attorney

mouthpiece for [Member Services]." Sec. Mut. MOL pp 10-11.

Mr. Cosgrove's report is little more than a factual narrative based upon his review of

select discovery documents and Member Services's other expert reports.  His proffered

testimony in this regard will not be allowed because it would serve only to usurp the jury in

its fact finding role. Linkco, Inc. Fujitsu Ltd., 2002 WL 1585551, at *2  (S.D.N.Y. July 16,

2002);[45] In re Rezulin Products Liability, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2001);[46]

---

[45] (excluding expert testimony because report "contained arguments and conclusory statements masquerading behind a veneer of technical language")

[46] (rejecting portions of expert testimony that was a "narrative reciting selected events because such material, to the extent that it is admissible, is properly presented through percipient witnesses and documentary evidence")

Media Sport v. Kinney Shoe, 1999 WL 946354 (S.D.N.Y. 1999);[47] Taylor v. Evans, 1997 WL 154010 (S.D.N.Y. 1999).[48]  Further, Mr. Cosgrove's testimony about the parties' history is inadmissible because it is not scientific or technical in nature.  United States v. Mulder, 273 F.3d 91, 101 (2d Cir. 2001).[49]

Finally, those portions of Mr. Cosgrove's report that address technical matters simply repeat Mr. Elliott's opinions and are not based on any personal or independent analysis by Mr. Cosgrove.  In this regard, Mr. Cosgrove addressed  the structure and operation of the parties' respective computer programs.  However, Mr. Cosgrove testified at his deposition that he did not view the parties' source codes for their respective computer programs, and the only "evidence" he considered in this regard is the report provided by Mr. Elliott. Ex. G, Cosgrove Tr. at 12, 13, 15, 36.

While an expert may rely upon another expert to form an opinion under Rule 703, an expert may not merely recite another expert's opinion as his own. In re Fosamax Products Liability Litigation, 2009 U.S. Dist. LEXIS 64661, *61 (S.D.N.Y. 2009).  Here, there is substantial overlap between the expert reports on the issues reported on by Mr. Elliot, and there is no reasonable basis to allow a second expert to testify about the same things. See e.g., Fed. R. Evid. 403; Price v. Fox Entertainment Group, Inc., 499 F. Supp.

---

[47] (where expert's testimony is not based on personal knowledge, but instead on his review of documents and depositions produced by the parties, the expert's testimony may not take the place of that of the individuals who actually negotiated the deal")

[48] (rejecting portions of expert report on the ground that the testimony consisted of a "narrative of the case which a lay juror is equally capable of instructing")

[49] ("[T]he district court should not admit testimony that is directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.")(interior quotation marks and citation omitted)

54

2d. 382, 390 (S.D.N.Y. 2007).[50]

The Court understands that the scope and functionality of the various computer programs, which are specific to the industry in which they operated, may be somewhat difficult for a lay juror to understand in the first instance.  However, testimony on these issues can be established through the testimony of lay witnesses, including from  Aaron Banks who purportedly was one of the authors of Member Services's program.  See Linkco, 2002 WL 1585551 at *1-2.[51]  For the reasons discussed above, Security Mutual's motion to preclude the testimony of John Cosgrove is granted.

### 3.  Michael M. Krieger

Plaintiffs have indicated an intent to offer the testimony of Michael M. Krieger, Ph.d, J.D.,  to provide testimony "about the value of the software technology (computer program code and its documentation, including requirements, specification and design documentation), business intelligence and any other assets acquired by [Security Mutual] from Plaintiffs."  Krieger Report, ¶A(1).  Dr. Krieger is an attorney practicing in the area of "computer/software/Internet technology and intellectual property" and an academician in the same field.  See generally id.   He advances a theory of "reasonable royalty" damages for the trade secret misappropriation claim.  Krieger Report at 8; see LinkCo, 232 F.

---

[50](precluding one of parties' expert witnesses because the proposed testimony would have been duplicative to that of another expert)

[51] (expert testimony precluded where expert's was report based on a review of documents, computer documents, computer files, deposition transcripts and exhibits, and finding that testimony by fact witnesses familiar with those documents would be "far more appropriate and renders the expert witness's testimony unnecessary for the education of the jury.")

Supp.2d at 186.[52]  Security Mutual contends that the measure of damages is a question of

law for the court, and that Dr. Krieger's opinion as to the measure of damages is not

based upon a proper foundation. Member Services argues that Dr. Krieger will not offer an

opinion as to the calculation or amount of damages resulting from the possible use of a

royalty formula, but will only "provide an expert opinion as to a possible range of royalties

that might be applied, in whole or in part, and only if the court determines that a

reasonable royalty approach is to be employed in this case."  Mem. Serv. MOL pp. 13-14.

"New York law provides three methods of awarding damages for misappropriation

of trade secrets - compensation for plaintiff's losses, an accounting of defendant's profits,

or a reasonable royalty – and the appropriate measure of . . . damages should be

determined after full presentation of the facts in the event that [the plaintiff] prevails at

trial." Topps Co., Inc. v. Cadbury Stani S.A.I.C., 380 F. Supp. 2d 250, 268 (S.D.N.Y.

2005).   A reasonable royalty damage calculation is used in trade secret misappropriation

---

[52]     "A reasonable royalty award attempts to measure a hypothetically agreed
value of what the defendant wrongfully obtained from the plaintiff." [ Vermont
Microsystems, Inc. v. Autodesk, Inc., 88 F.3d 142, 151 (2d Cir. 1996)
("Vermont Microsystems I")].  To measure this value, "the Court calculates
what the parties would have agreed to as a fair licensing price at the time
that the misappropriation occurred." Id. (citing Georgia-Pacific Corp. v. U.S.
Plywood-Champion Papers, Inc., 446 F.2d 295, 296-97 (2d Cir.1971)).
Because the plaintiff's loss or the defendant's gain may be very difficult to
calculate in intellectual property cases, a reasonable royalty is "a common
form of award in both trade secret and patent cases."  Vermont
Microsystems, Inc. v. Autodesk, Inc., 138 F.3d 449, 450 (2d Cir. 1998)
("Vermont Microsystems II"); Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932
F.2d 1113, 1128 (5th Cir.1991), aff'd, 505 U.S. 763, 112 S. Ct. 2753, 120 L.
Ed.2d 615 (1992).  Moreover, a reasonable royalty is ideal when the
commercial context in which the misappropriation occurred requires
consideration of multiple factors in order to compensate the plaintiff
adequately. See [University Computing Co. v. Lykes-Youngstown Corp., 504
F.2d 518, 538 (5th Cir.1974)].

LinkCo, 232 F. Supp.2d at 186.

cases only when the first two methods are deemed to provide "inadequate compensation to the plaintiff."  LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp.2d 182, 186 (S.D.N.Y. 2002). "Although the amount of recoverable damages also is a question of fact, the measure of damages upon which the factual computation is based is a question of law."  U.S. for Use of N. Maltese and Sons, Inc. v. Juno Const. Corp., 759 F.2d 253, 255 (2d Cir. 1985).

The parties have not fully addressed the damage calculation that should be used if Plaintiffs prevail on the trade secret misappropriation claim.  Should Plaintiff not succeed on this claim, or should the Court conclude that another method of damages be employed, the motion to preclude Dr. Krieger's testimony is rendered moot.  To avoid a potentially unnecessary opinion, the motion is denied with leave to renew at trial.  The parties are instructed to include in their pretrial papers a memoranda of law addressing what measure of damages are to be employed in this case.  Should the Court determine that a reasonable royalty measure of damages will be used, Security Mutual may renew its motion to preclude Dr. Krieger's testimony and, if the motion is renewed, the Court will conduct a short hearing to determine whether there is a proper foundation for the testimony.

IV.    **CONCLUSION**

For the reasons set forth above,

Plaintiffs' Motion to Strike Documents [dkt. # 233] is **DENIED;**

Security Mutual's Motion for Summary Judgment [dkt. # 219] is **GRANTED IN PART and DENIED IN PART**.  The motion is granted in that the Breach of Fiduciary Relationship claim (Fourth Cause of Action) and the Tortious Interference with Business

57

Relationships and Prospects claim (Seventh Cause of Action) against Security Mutual are dismissed *en toto*.  The Breach of Implied Duties of Good Faith and Fair Dealing claim (Fifth Cause of Action) is dismissed only to extent that the claim is premised upon the allegation that Security Mutual breached this duty by terminating the Worksite General Agent's Contract.  The motion is denied in all other respects;

Plaintiffs' Motion for Partial Summary Judgement [dkt. # 226] is **DENIED;**

Schmitt-Sussman's Motion for Summary Judgment [dkt. # 215] is **GRANTED** in all respects, and all claims against Schmitt-Sussman are **DISMISSED;**

Plaintiffs' Motion to Exclude Testimony of Gary L. Tinkel [dkt. # 212] is **DENIED;** and

Security Mutual's Motion to Exclude Plaintiffs' Expert Witnesses [dkt. # 233] is **GRANTED IN PART and DENIED IN PART**.  The motion is granted in that the testimony of John Cosgrove is **precluded**.  The motion is denied with leave to renew as to Michael R. Elliott on the issue of Mr. Elliott's testimony regarding the *SEGSoft* program.  The Court refers to Magistrate Judge Peebles the limited issue of determining whether the *SEGSoft* program was properly certified either by initial disclosure or by some later disclosure allowed under Magistrate Judge Peebles's discovery order(s).  The motion is also denied with leave to renew as to Michael M. Krieger.

**IT IS SO ORDERED**

DATED: September 30, 2010

Thomas J. McAvoy
Senior, U.S. District Judge